Good morning, everyone. The panel has before it, of course, two pieces for argument this morning, namely Appeal No. 06-5051, Cienega Gardens v. United States, and Appeal No. 06-5052, Chancellor Manor v. United States. As you can see, the Court has assembled a large panel, which is statutorily permitted, and among other reasons, we wanted to be able to involve the judges who were on the last two, three-judge panels that heard these respective appeals. For the benefit of all counsel in both cases, you may expect that you'll have 20 minutes per side rather than the normal 15. Beyond that, we may, through the force of questioning, run over even that period. In no event will reserve rebuttal time of either appellant be diminished. So the full five minutes reserved to our courtroom deputy in the clerk's office will be awarded regardless of the length of the questioning. I hope that's clear enough to everybody. Mr. Dintzer, welcome. Good morning. Please proceed. May it please the Court. The trial court failed to undertake the sweeping analysis required by the Penn Central test, and instead applied a truncated approach to each front of that test, which caused the Court to reach the wrong conclusion regarding the early statement. Turning first to the character problem, in considering the character of the government action… Can you help us out with the standard of review on these three Penn Central factors? Is there a clearly established standard of review for an appellate panel on those three factors? We believe, Your Honor, that it's a de novo review regarding the legal aspects of it, which is… Well, that's kind of circular. What are the legal aspects, and what are the factual aspects, so that we can apply the appropriate standards? The framing of the test is legal. The question that is asked, whether it's the character problem or any of the other problems, the framing of it is, what you're looking for, that's a legal standard. Then the factual finding on whether they met that is obviously based on factual findings. Well, how about with regard to the severity of the economic impact? Is the selection by the trial judge in this case, from between two competing models offered by the two sides, a question that we review de novo, or for clear error, or for abuse of discretion, or what? The court should review a de novo, Your Honor. Wait a minute. Based on what authority? Based on… I would compare it to, in the damages context, when the selection of the damages model, the DACO case, the selection of the model… I read in your brief the citation to DACO, but of course, that's a contract case, not a takings case. And in that case, where we focused on reasonableness, that seems to me to translate most naturally, or correlate most naturally with the abuse of discretion standards. So to say that something's reviewed de novo, but for reasonableness, is self-contradictory. If it's reviewed for reasonableness, it seems to me that suggests that there are several possible proper answers, and the trial judge has some range of discretion to choose from alternatives, let's say, A, B, and C. So that's not de novo. That's the opposite of de novo. That's highly deferential. So I'm lost. To the extent you're depending on DACO, I have a lot of trouble following that. Your Honor, stepping back and just taking a look at the question that is asked, what we're trying to… what the court wants to do, presumably, is to create a test whereby similarly situated plaintiffs will come into court and be treated the same. What we have is, if the trial court can pick the standard, the test which to apply, not only how to apply it, but if it can pick the test, then you'll have two similarly situated plaintiffs walk into… join in courtrooms and walk out with different answers. Well, that might not be so bad, because it may be that in one case, the facts needed to drive Model A in the choice of A versus B wouldn't be available, whereas in another case, the facts needed to utilize Model A would be available. So obviously, in that kind of a circumstance, a different model would be chosen in one case versus the other because of the data that's available. Your Honor… There's nothing inherently unfair or wrong about that, is there? Is there? It depends, Your Honor. It depends on the circumstance. Speaking more concretely, what we have here is we have, in this case, the trial court picked one approach. In the City Line case, where the plaintiffs are alleging the same type of claim and bringing the same type of evidence, the trial court concluded that the change in value… that applied the change in value approach… The problem that I'm having is that the parties differ to a great extent on the effect of the statutes that we're dealing with here and the interpretation of those statutes, which presumably is a legal question. And I think that both sides don't do the kind of job that they should in explaining how these statutes operate. They're complicated statutes, and there's a real difference. You say that the effect of the statutes is to allow the initiation of a process two years before, which can culminate in a sale at fair market value, either to a qualified purchaser or after 15 months to somebody else. And the other side takes a different view of those statutes. Those kinds of issues are presumably legal issues about statutory interpretation here as to what the statute means, right? Yes, Your Honor. And one of the things that they say is that you couldn't complete this sale process until a long time after the prepayment date of the mortgages. You say that you can complete the sale process by initiating the process two years before the prepayment date, correct? Yes, Your Honor. And they say, no, no, there's a provision in the statute which says that the fixed rents will continue for three years after the prepayment date, correct? Yes, Your Honor. And what's the answer to that? It seems to me that the statute talks about three years for low vacancy areas and special needs people. How has the Secretary interpreted that? I don't have an answer for you, Your Honor. I don't know if that portion has been interpreted. There's nothing in this record for either party about the interpretation. But what I can say is that if they do prepay, I mean, if the Park Ridge Investors case, for example, looked at this and said, look, they want one of two things. Either they can get out of the program. There is a delay in raising rents. They can still prepay and they can still start moving to market rents. Your theory is that they can prepay the mortgage. As I understand the way the time schedule works, they can prepay the mortgage one month after the original prepayment date. Your Honor, it's not block and stone. If they start two years in advance, it's approximately a two-year process. Sometimes it can take a little longer. And so if they start two years in advance, they can presumably pay right at the prepayment date or shortly thereafter. So your theory is they're not restricted at all if they begin the two-year process two years before the prepayment date. If the process goes the way it should, then they should not be. They should be able to prepay. Your Honor, I just want to clarify and make sure that the court understands. The statute allows two ways out. One of them is if you meet the statute or standard, you file a plan of action under 4108 and you say we meet the statute or standard and you prepay and leave. Yeah, but the judge found that that was futile. That wouldn't work. For these plaintiffs, that is the case. Put that aside. Put that aside. Then there's the second way, which is you go through the 4114 process, and that process is you seek a use agreement or a sale. And if the government does not fund a use agreement before you sign it, if they say, well, we're not going to do that, or if there's not a buyer on the sale prompt, then you wait 15 months to see, and then you leave. You can exit the program. There are some restrictions after you end the program. And your theory is that that could happen on or about the original prepayment date. Yes, Your Honor. Were there any findings by the trial court about the feasibility of accelerating the process so that the two-year, approximately two-year process would be over as of the prepayment date at 20 years? The court didn't make specific findings about that. He did find that it was, especially in the Los Angeles office, that there were certain delays and that it might take longer than two years. Yeah, but the question isn't whether it's exactly two years or two and a half or one and a half. The question is, can somebody start correspondingly early enough that they can be reasonably assured that the process will be finished by the original 20-year prepayment date? Yes, Your Honor. There's testimony to the court about that. But no findings? With the court's direct, for the length of how much time, I don't believe the court made specific findings for these plaintiffs about how long it would have taken. No, because the court did not look at the length of time that it would have taken. In line with Judge Stites' question, you're effectively asking us to find that there was no diminution in value under any measure for he who was alert and started the process two years or so in advance, and therefore any harm was self-inflicted, therefore no liability for the government, right? In a sense, Your Honor, that's what we're saying. But that argument is based on an assumption of a set of facts as to which we have no findings and, as I recall, very little evidence. Your Honor, the sale option, we put in evidence about the sale option. The plaintiffs did. The statute is you can't sell under the preservation process. That's not what's disputed. The question is whether you can start the process two or three years early so that it will reliably be finished as of the original 20-year prepayment date. It looks to me like on that you have no findings, explicit or implicit, and very little evidence. The record shows that A103237, the testimony of the sale, took approximately two years or a bit more, Your Honor. At A103239, under Title VI, owners could file two years in advance. So it is in the record that they could meet these benchmarks. The point is the availability of the sale option makes it so that under the Conte case and under Ford and Roth, the availability of being able to sell at market value diminishes any other economic impact. In Conte, the plaintiffs came in and said, look, your drift net regulation has cost me the value of my fishing boat. But you're talking about availability to sell at the diminished market value under the restraint. No, Your Honor. The property is valued under the statute. The property is valued as if there's no restraint. Exactly. That's what I was thinking. But who is going to buy at that market value when they also have to accept the restraint on rents? Well, Your Honor, because HUD financed the buyers, 95% of the buyers' money that the buyers came in with came from the taxpayers. There were always people who wanted to buy. No, but the answer is that once you go through the sale process, you're free and clear of all restrictions once you can sell, except for the three-year provision that we were talking about earlier, right? There are some restrictions after the sale, Your Honor. No, but which restrictions? There are limits on the ability to raise rent, I believe, on the people in place after the sale. For three years. For three years. But that's only in low-vacancy areas. But apparently nobody's explored what the effect of that provision is, right? That is true, Your Honor. And plaintiffs have the burden of proving that we're improving everything in this case. So to the extent that the record is vacant on their proof as to exactly how that would have affected them financially, then that is a failure of proof on the plaintiff's part. In answer to Judge Newman's question, there were 47 sales identified by one witness. In the state of California, the testimony was that every person who went and looked for a sale, who chose that option, found a buyer. So it is not speculative to think that they would have been able to find somebody to buy the property. So in that case, the injury would be the obligation, the forced sale, rather than whatever the investment plans may initially have been in entering into this arrangement with HUD. No, Your Honor. The only way you can protect your investment at all would be to sell the property that you had expected to hold as a lessor. No, Your Honor. Respectfully, the ability to sell is a choice. You don't have to do it. But knowing that you can sell at market rate means that whatever else you do is your choice because you can always turn around and sell at market rate. So there's no other economic impact, which is why the Court of Economy and the Court before Iraq, they didn't feel like they had to go and perform the rest of the economic impact. So in your view, is that a matter of affecting the damages or whether there is fundamentally a taking, which is actually behind us in all of this case? It goes directly to the harm of the taking question, Your Honor. In fact, the ability to sell and the entire preservation scheme that the government set up, that Congress set up, was completely ignored by the trial court in considering the character problem. The way it looked at it, it was a moratorium. You can't do that. It refused to look at the sale-off option. It refused to look at the use of remand. Well, you can't fault the trial court for following the instructions that it received for the remand to determine the injury. Your Honor, these are not the model plaintiffs. They were not up here on Cienega Garden 8. And this is a fact. Of course. But the reason they were model plaintiffs was so that we would not have to review the fundamentals for each property owner. It would be decided for the model plaintiffs. Yes, Your Honor. But in the Cienega Garden 8 decision, the court recognized that the government had provided limited arguments and a limited record. And so the court said, regarding future cases, to the extent that the government can demonstrate affirmative errors through reference to additional evidence and flaws in the arguments in future cases, in which plaintiffs make the same arguments, this opinion should not be understood to bar future courts from also considering that evidence in those arguments. Exactly. In terms of different circumstances, perhaps applying to different property owners. But you're saying that the fundamental principle of the taking, that that decision was flawed for the model plaintiffs as well. Well, Your Honor, we're not appealing the model plaintiffs. So I would say that the government does believe that there wasn't a taking in those circumstances as well. Obviously, that's not here on appeal. What we do believe, though, is that the court clearly identified in a number of caveats in that opinion that we have the right to come in freshly and make these arguments. The court did not consider, in that opinion, the sale option as well. But you must show a distinction between the ensuing plaintiffs and the model plaintiffs. The distinction, Your Honor, is in the proofs. It's in the fact that that court did not have a chance to consider what impact the sale option had. In fact, in the recent Independence Park decision, which was the model plaintiffs, that panel said expressly that, quote, at no point in that case, referring to Siena-Guardian 8, did we discuss the 1995 use agreements that are affecting the plaintiff's legal rights. Siena-Guardian 8 didn't even consider the import of the use agreements. And we believe that the use agreements directly go to both the character problem, the fact that the government was making them available, and to the economic impact problem. None of which was considered by Siena-Guardian 8. But following up on Judge Newman's question with regard to the availability of a fair market value sale, that's an option. But that's not an option where I can keep the property and pay off the mortgage. That's a mandatory sale. That's the only way I can get out from under the restriction. No, Your Honor. Respectfully, you can get out also by going through the process. If the government doesn't offer you a use agreement, or if nobody comes through the box, then you can get out of that. But that's the only choice. But it's not a mandatory sale in the sense that you have the choice. The only thing that the Fifth Amendment protects you on is the right to have the fair market value of your property. If we went in and we just took their property, the thing that the Fifth Amendment will protect you, that they should receive the market value of the property. The fact that Congress made that available, and then other options, too, we shouldn't. That should be held that there's no character of government action that's trying to make benefit and trying to avoid impacting the property. The fact that we've added other options should not be counted against the government. But the first option is almost like a mandatory condemnation. We take the property through a sale to a third party, and we finance that sale. I just thought that the word mandatory, Your Honor, in that it was always made a choice to the plaintiff. If they wanted to get out, and they wanted, the court didn't understand the nature of the use agreement just to understand what else the other option that they had. The use agreement was you sign an agreement, and all those restrictions that you felt during the first 20 years, they drop. The limit on paying dividends drops from what it used to be all the way down to zero if you choose. You can choose no more limitations on dividends. The limitation on rent increases. You sign the use agreement, rents go to market rate. You sign the use agreement, you can take out a loan against your property. The use agreement is providing extensive opportunities to reduce the regulation. So, yes, you did have the choice to sell. You also have the choice to sign the use agreement and drop the regulation to keep the property. Or you could continue on in the program as you had the past 20 years and wait for the mortgage to be paid off. But under the use agreements, wasn't there still a limit on the rent you could charge to current tenants? The way that they worked, Your Honor, was the rents were brought to market rates at that time. Going forward, yes, there were certain limitations on rents going forward. But the reduction in regulation brought about by the use agreement is significant. I'm not questioning that you can say it's significant. The point is it's not total. It is not total. It is not total, Your Honor. But if the court had— there are a number of errors with the approach taken by the trial court, the snapshot approach. One of which is— What were the benefits that were given under the use agreement alternative? What were the benefits that were given to the owner? I would characterize it in two categories. One of the benefits with actual money is Section 8 contracts with the plaintiffs. They got more Section 8, which means that the government funded more of the tenants and that more people could come in at the maximum rent and take away more money. The other set of things did not benefit so much as a reduction in regulation. That was the ability to take out a loan against equity of millions of dollars, the ability to eliminate your dividend regulations, the ability to tax equity accounts in the property, and the ability to raise rents to market ends. While, Your Honor, I agree that the market increases after you sign it are not necessarily as fast as market rents. They increase quite a bit faster than they had before. So we're talking about an escalation of rents that were quite significant. But if I'm out of the program, I go in an instant from controlled rent, let's say half the market rent, to 100 percent of the market rent the next day, right? Well, not necessarily, because then everything moves out, so maybe you level that in. But when you go out of the program, you also face certain risks. If you go out of the program, all of a sudden, instead of having a 1 percent HUD-guaranteed mortgage, you're facing a regular market mortgage. Instead of having HUD provide Section 8 assistance, instead of having lower-income people who you know are willing enough to live in your place, you have to compete against the convention. Having HUD property is a lower-risk endeavor. That's why some plaintiffs have not prepaid even after all restrictions were pulled away. In the model plaintiffs, Keiko Plaza was one of the model plaintiffs, they never prepaid. All restrictions were torn away. Prepaid any day, has chosen not to. There's a real benefit. The government had people signing new subpoenas after the whole act was passed. Excuse me, I didn't want to jump in on you there in the middle of a sentence, but time is fleeting. Let me ask you, you argue that the Court of Federal Claims erred in using the return on equity approach, correct? Yes, Your Honor. Okay. Now, assume for the moment, and I realize you would disagree with the assumption, but assume for the moment that the return on equity approach was the correct approach. Yes, Your Honor. What, if any, errors do you say there were in the Court's application of that approach? There would be two. First, there would be the fact that it only applies in Test 1. It's a snapshot approach, which means it takes a picture at one point in time. No, but that's whether it's the right or wrong approach. You're getting back to your argument that it's the wrong approach. Assume it's correct to look at that snapshot, that period. What, and I realize you disagree with that, what errors do you see in application of that approach, which you say was wrong? They didn't do it enough. They didn't do it enough times. If that's the right approach, you have to do it every year because the numbers in the model change year, year, year, year. And we know that. For example, the Fannie Mae rate, which is the 8.5%, that goes down each year. And the Court only applied it at the very first year. So we know that it should have applied it, even if that's the right approach. Then the answer is we should remand for further factual development. But in the end of your blue brief, you claim a right to have an outright reversal, page 71. Well, I'm starting from the premise that this text is the right one. If it is the right one, and if the Court need not look at the change in value, then at a minimum, yes. But, Your Honor, if the Court were to look at the change in value approach, which we believe is the correct approach, the Court would find that the economic impact was as low as 12.9%. Well, could it be that the trial judge should look at both models, consider both models, and presumably come up with some sort of intermediate figure? At a minimum, we believe that the case law says you have to look at change in value. So, yes, at a minimum, it has to look at that. If the Court was going to look at an equity-based approach, like the snapshot, it's still a bad approach, given that there would still be ways that it would have to be changed or fixed, even if it was going to be applied. You're in an intermediate position between the two of you, in the sense that they may be correct that the change in value approach is wrong, because it doesn't really take account of the lost income. But isn't it possible that the correct approach is to look at the lost income and compare it to the overall value of the property? If I could start with the beginning part of your question first. No, start with the end of it. I don't believe so, though. You don't believe so what? I don't believe that an income approach would be the best one. No, no, no, that's not my question. My question is, isn't there an intermediate position where you'd say, okay, what's the lost income? Calculate the lost income, and you compare that to the entire value of the property. Yes, sir. That would be the change in value approach. No, it's not the change in value approach. If you take the income, the way that you value a property at time f, is you look at all the income, and you discount it back to a certain date. If you're going, if you say, okay, what's it with the regulation, you say, how much income does this allow for our expertise? I don't think you understand my question. The question is, in a temporary taking, you've lost the use of the property for a period of time, let's say a year, two years, three years, whatever it is, and you can calculate the lost income during that period. Yes, sir. Don't Penn Central and Tahoe suggest that you have to compare that lost value with the overall value of the property. Yes. And if... First, because those losses are in the future, you definitely have to discount so that you're talking about a correct time. And if you do that, effectively, what you've got you on is the change in value. Because if we value an apartment building for a million dollars, that's based on what income... No, that's not true. Under your approach, you're essentially saying that there's no economic impact because property values in general have increased during the period. But, you know, a change in value approach sometimes can yield a severe economic impact, but sometimes there's no economic impact because the values of property together with the market have gone up. And it seems unfair under those circumstances just to look at change in value because there's no loss as a result of the change in value. But they say, we could have rented it for a year. We could have rented it for two years. We lost that income. You know, and that may be an appropriate approach sometimes, but don't you have to compare that to the overall value of the property so you're not stripping out some one strand? If I can clarify, because the court is connecting two arguments. One is that you say, under the snapshot approach, the court should have, but failed to, consider the rise in the value of the property. That is separate from the change in value. We are not saying, and I think this is really confusing, we are not saying, we look at the value of the building on date A, and then we look at it on date B and see if it changed. What our expert did, what our appraisal expert did, was this. He said, the value of this building, as if there were no regulations at all, on date A would be this. Looking at the income, because there would be reduced income under the regulation, and we do acknowledge that. The value of the property under the regulation at that same date is lower. And he says, what's the difference? And there is a difference. We do find a difference. And then we say, and then we do what the court is asking, which is we put the reduced amount over the original amount, and that's where we get the change in value. And that is, for example, Blossom Hill, 13.3% economic impact under change in value means that the regulations reduce the value of the building on the date of the initial taking by 14.3%. That is what our experts said. Now, we don't believe, under the case law of this court, that that is sufficient economic impact to support a payment. But it absolutely took into account every dollar of a life's lost income. In fact, we did the test a second time. We took the plaintiff's damage model. We said, okay, how much money do you think he lost? And from the model, the valuation of the property, and we did the same test. But based on your own analysis, in fact, their damage model produced lower economic impact than our experts. Mr. Jensen, excuse me again. I'm just trying to still understand what you said in response to my question. If one accepts the court's return on equity approach, which I understand you say is wrong, what error was there in the court's application of that approach? When you say only took it once, what do you mean by that? Those numbers change from year to year. But we know that the snapshot – I mean, you can look. They only took one snapshot. And so that was – and after these properties' time of use agreement, the numbers changed dramatically. Did you argue this below? Absolutely, no. Is that where you cite to in your brief? I – In the brief, in your reply brief, you come back and cite to a page in your post-trial briefing. Is that where you argue these points? I believe so, Your Honor. But I'm quite confident we made these arguments. I mean, we spent quite a bit of time discussing the flaws in this text. And one of – and the reason that this taking it more than once, if it's the right test, is important. One thing is not in the use agreement. The use agreement significantly raises the rent, and they take out equity. So the equity drops substantially. And so all of a sudden, even under the snapshot approach, if it were applied after the use agreement, there wouldn't be enough economic impact to support a taking claim. That's why we asked the court, you know, hey, please look at after the use agreement as well. They wouldn't. And, in fact, Clayton's expert acknowledged that he didn't look at the numbers after they signed the use agreement. But if you take a return on equity type of an approach, every single time you have a temporal taking, if you take the time period from, let's say, 1998 to 1996, during that time period there was always a diminution of return on equity. Is that correct? I'm sorry. During the time period of temporal taking between 1988 and 1996, that eight-year time period,  you're always going to have a lower return because of the restrictions. I don't know if that's true after the use agreement. Well, wait, wait. Without the use agreement, you always have a lower return on equity during that time period. So if you have even a, without a use agreement, at the end of the taking period, you would still go back to the original equity return, right? So during that time period, like we had in Tahoe, in Tahoe there was a complete taking for a certain period of time. You couldn't develop the property at any time during the restriction on development. Now, if we had the same taking here, same type of a taking as we have in Tahoe, which would completely eliminate any development of the property or any income from the property, you would always have a taking under the theory of equity return on equity. But at the end of that time period, if you use a profit denominator under Penn Central analysis, you would not have a taking because you would have a diminution but not sufficient enough to meet the requirements of a regulatory taking. Your Honor, respectfully, respect to Tahoe's here, they concluded that you should apply a categorical test to the fact that there was a moratorium so that they couldn't build for a few years. So they didn't find a good way to take it. The trial court was concerned about was that when you have a temporary taking and you get the property back, it's going to be hard to show enough economic impact. The example they used is if you have a complete restriction for four and a half years and you get the property back and you've only got 45% economic impact in that temporary taking. The idea, first of all, there's two problems with that, Your Honor. One is the idea of having an easier test for temporary taking is simply unfair to people who face permanent taking. It should be a uniform test. The snapshot approach produces numbers well over, can produce numbers well over 100%. It can't compete, those percentages can't be compared in any way to the changing value numbers. It's just apples and oranges. But second, the idea that... Are you saying that under a return equity type of a test you'd always have a taking? It's not that you always would. But let's say you had a week where you couldn't open your business. And during that week, because the place next door had a fire and they wouldn't let you open your business. That would be 100% economic impact. It would just take a week. It would take a day. Because the test doesn't have a temporal element. It doesn't aggregate amount. So it would be very easy. I wouldn't say always, Your Honor. I would say that with this test, it has become... I mean, this test would redefine what a taking is. It would be significantly easier than the 75, 80% plaintiffs who lost 75% of the economic value of the property in the prior case. It extends away. You could lose a lease with pay. And I'll give you an example. Mr. Dinsel, let me pose this hypothetical. Isn't there a difference between... Say there's a 10-year leasehold and a government regulation extinguishes or puts a freeze on that leasehold for two years, 20% of the time. Is there a difference between that and a regulation that simply diminishes the overall value of the leasehold over the 10-year period by 20%? Well, Your Honor, if you started with a leasehold, obviously, the number of sticks that you have in the back there are... A regulation that limited that for two years would be... The proper way to value it would be to value those two years versus the value of the entire leasehold. So it would be a change in value of whatever that is. 20%. Presumably, although it might be more if you have a discount. So seemingly, those situations are, from your perspective, the same. Yes, Your Honor, which I believe is what the court did in Congress here. It said, when you have a moratorium, the fact that it's a moratorium doesn't mean that we're going to weigh it differently. And in fact, most of the takings cases that this court and this Supreme Court have looked at, whether it's merit trends or forest problems, what you're looking at is people going through a regulatory process, and while going through it, they are frozen. They can't cut their lumber, they can't fill in the wetlands, and during that time, they can't chop down trees and sell them, or whatever the business happens to be. But the court has always said, we will look at the property as a whole. And fast enterprises, and especially CBER, CBER was a temporary taking case in this court, a temporary denial of a logging permit. This court applied the change in value approach. And they said, that's the proper test. Because, I mean, quite honestly, first of all, if you apply a different test for a temporary permanent taking, several things would happen. One would be that there would be some times when what you're doing is incentivizing the government not to do the thing that we could face if you're going to have a different test between one and the other, it would say to the government, well, you face a harder test if you give it back. But, of course, the incentive that we want is if the government doesn't need it anymore, give it back, and then face whatever consequences you face. But it seems to me that if that's the case, then in the real estate context, there would almost never be a taking if there was a temporary restriction of that court or another, because you could almost assume that in most real estate contexts, the value of the property will always appreciate. And sometimes appreciate more than any temporary interference. Well, the appreciation is, I mean, the valuation for a piece of property, the proper way to do the change in value approach, typically, is you look at it, you measure it from the same day. So it's not a, okay, what was it at the beginning versus what was it at the end. It's from the beginning time, what is it with the restriction and regulation and what is it without? So it would be an ex-ante analysis. It would be a time of the taking. But temporary takings are temporary. The whole idea of, really do the economic impact wrong according to the legal case, the existing legal cases, you're looking for a functional equivalent of a physical taking. And when you simply regulate it, and I'll give you an example. Skyline View only states that 12.9%, this is our measurement, of change in value. The plaintiffs had it well over 90% under ex-ante. So if you're talking about a plaintiff who faced literally just barely a potential set of a change in its overall value, but because there's this new test that produces very high numbers very quickly, it could be effective to make it look much more standardized. And we've given you almost 18 minutes of additional time, so I think we better hear from the other side at this point. Thank you. Thank you. Good morning. How are you? Very well. Please proceed and you may, if you need it, considerably expand your argument. Thank you. I'd like to start off talking today about the sale option, because I understand that there are really some questions about precisely how the statute works and how long we have to sell the plaintiff in terms of the fair market value. And I'd also like to address how I think it ought to be viewed. The counsel for the government was correct that under Title VI, which is LIFRA, you could begin the process two years before your prepayment dates, but what he didn't tell you was that the regulations that were necessary for you to follow under LIFRA weren't enacted until April of 1992. Not every statute tells you what you can do, doesn't it? Well, no, because you couldn't start the process until the regulations told you how. The government hasn't disagreed with us on that. The regulations set out in quite a lot of detail exactly what steps you should take, and there were no plans of action that were filed in process before the rates came out under Title VI. And for our properties, three of them, Cienega, the date was December of 1991, so just four months before again. Del Amo was one month beforehand, March of 1992. Los Lomas was July 15. That was after the rates came out. So for those three properties, quite clearly, you couldn't even have started the process for a sale until about April of 1992. Was there testimony of that? Yes, there was, Your Honor. Who? I'd have to... I'm paraphrasing, Your Honor. So for those properties, if you take even the government's estimate of a two-year process, and I'll explain in a moment that that's wrong, but if you took that, then there would at least be a two-year gap between your prepayment date and when you can sell. Now, why it's wrong... For those plans. For those three. For those three. And those are the three, Your Honor, that science uses very much, and they have much more substantial damages than the other two, which are lost employment style. But if you could sell, and it would take you two years, you're just deprived of the use for two years, right? You're deprived of more than that, Judge Steinberg, in two ways. First of all, the appraisal date is going to precede much of that time period. So they appraise,  to find a seller, sorry, to find a buyer, and then it has to go through the approval of your plan of action. So your appraisal date is going to be a couple of years before you actually sold. So if there was depreciation in the interim, you weren't going to get the benefit of that in your fifth sale price. So when the argument talks about fair market value, even if one assumes that the process that they set up with the different appraisers from the other meeting, et cetera, was a fair process, the process was still on a two-year lag. So you weren't going to get the value, whatever it was, two years later. Was there any evidence that there was a loss of value as a result of that? I thought the only evidence that you presented was lost income. Well, Your Honor, we didn't present evidence of lost value for that because we didn't take the sale option. No, but under the statute, the sale option was available. The question, in order to determine the economic impact of the taking, you have to consider the availability of the sale option and what that would do to the value of the property. And the government's contention is that under Tahoe, the court said that you must consider the impact of things like the sale option and the use agreement and factor that into the value in computing economic impact. Your Honor, with due respect, I don't think that there was a holding, an understanding, a fortune-telling manner that the value of those items had to be taken into consideration. No, no, no. I'm talking about the Supreme Court's decision in Tahoe. It says explicitly, and that's the difference between the majority and the defendant, it says explicitly you have to take into account the overall value of the property and the impact of the regulation on the overall value. Your Honor, I would agree that Tahoe said that for categorical takings, you've got to take into account whether what was taken from you in light of the lifetime value of the property, whether that took all of it. On the other hand, when the court, first of all, the court quite expressly said it wasn't ruling about partial regulatory takings and it sent the case back for penitential analysis. Further, the court said that it might be that you should be particularly skeptical of any moratorium that lasts for more than a year. Now, if the court meant to say that you have to look at the change in value approach when you're talking about real estate, a one-year moratorium would not raise particular eyebrows because one year out of a 50- or 100-year useful life... I'm not understanding. The Supreme Court says it says explicitly, District Court heard when disaggregated petitioner's property into temporal segments corresponding to the regulations of the issue and then analyzed whether petitioner were deprived of all economic value. So why would you treat it in terming economic impact any different, any differently when you've got a Lucas situation or when you've got a Penn Central now? I think there's good reasons to do so, Your Honor. First of all, any of these tests that we're applying are, of course, only ways to try to figure out whether what the government has done meets the Armstrong test. And the court has been quite clear that we don't rely on set formulas. And so different contexts are going to have perhaps different rules. The reason why the categorical taking is the case, I think it's quite important that the court correctly recognized that the categorical taking is the case if you took the period of the temporary taking and that's all you looked at, then any moratorium, no matter how long or how short, any complete moratorium is going to be 100% taking and therefore categorical and therefore the government would have to pay. And the court recognized that not every situation like that is one where injustice and fairness is a burden that has to be put on society as a whole. When you're looking instead under the quintessential factors, do you have other factors you can look at as well? You can look at the character of the taking and you can look at reasonable investment back to expectation. You know, can, must. Must. Must, Your Honor. And so given that you look at those other factors... So the economic impact analysis is different whether you're looking at a Lucas taking or a non-categorical taking? I believe it should be, Your Honor. What case says that? Well, I think the fact that Sanity Gardens... Now, apart from these things, what case says that? Rose-Acre. What case? Rose-Acre. Rose-Acre didn't decide anything about models. It sent it back for the decision to be made by the trial judge. What Rose-Acre did, though, as Your Honor well knows, is that it rejected the United States' argument that use of the change in return on equity model as opposed to the change in value model was per se inconsistent with its taken jurisprudence. And when this court sent it back, it suggested that the return on equity model may be more appropriate in cases where you're talking about an ongoing business, a long-term taking of a long-term business. There was no holding about which method was required or in what circumstances. I agree, Your Honor. But all I'm saying is that this court... Then it's not authority for anything. Well, it's authority for rejecting the government's argument that in those circumstances can you use the return on equity model as opposed to the change in value model. The court quite clearly rejected that argument that the government made. But we're not... You don't know what we're talking about. You won't decide. You don't know what we're talking about. What we're talking about is whether in a temporary taking you have to consider the impact on the value of the property as a whole, whether you calculate the lost income or the change in value or whatever it is, whether you can discard the consideration of the property as a whole. And the court of federal claims here said, no, I'm not going to consider the value of the property as a whole. I'm only going to consider the impact during the period of the temporary taking. And what's the authority for that? Well, as I said, when it did that, it was following this court's direction in Sanford Gardens. But that's on one side. What's the case? I don't think there's a case other than this line of cases in this court that has addressed the issue one way or the other in terms of temporal taking. And I think when you look at the Supreme Court, first of all, the Penn Central itself, the court looked to return on equity as one of the measures. When you look at... But it said you had to consider the value on the property as a whole. Well, first of all... There's case after case that says that. There's case after case. Is there not? Under the Penn Central analysis it says you have to consider the impact of the regulation on the property as a whole. There is not a case in this court that has looked at the temporal aspect of takings and has said that you've got to look at the property as a whole temporally when you've got a partial regulatory takings. And the problem with doing that, Judge Linn, I think that you put your finger on it to some degree, is that if the government is right in this case, then they can take someone, they can go to a farmer and say you can't grow any crops on your farm whatsoever for the next 20 years. And so long as the property is appreciated somewhat over that time period, that's okay. And the problem with that... That's exactly one of the factors that has to be taken into account. Not the entire aspect, though. You still need to have some kind of analysis. I was about to present that earlier and I agree completely because I think the problem with taking that approach, and you can take this case as an example, is, as this court found, what happened here was akin to a holdover tendency by the government. The only distinction being, and I understand it's the distinction that matters for a per se taking reason, but the only distinction being instead of the government moving its own personnel into these buildings, the government required... But this isn't a physical taking, it's a regulatory taking, and when the change in value approach is considered not the appreciated value after the period of the temporal taking, it's at the point that the temporal taking took place, what was the value and what is the lost income compared to that value. Your Honor, I don't think that that formulaic approach, if I may... But it doesn't take account of the appreciation in the property, right? That approach to it does not deprive you of the value of the appreciation in the property over the time. No, but the appreciation in the property wasn't realized during that period, and Your Honor, if I may, as the three of these properties which signed these agreements, we don't yet know, one of them we can't know because it's sold out for these agreements, and the other two, the properties don't come out from those agreements until 2011, 2012. If you try to take appreciation into account right now for those properties, I would suggest that what you're doing is telling paper games that have happened during the last several years, and telling the property holders you're charged as a accumator... But that's not what the government's arguing. That's not what their evidence shows. They didn't take the value 20 years from now or 10 years from now after the temporary agreement was concluded. They compared the property as a whole value at the time of the taking, which doesn't factor into it the appreciation. Correct? Actually, it does, because whenever you're doing a property valuation at any time, you're doing it on an income approach. What you're doing is you're discounting back... You're not answering my question. When they made the comparison, it was the value of the property at the time that the restrictions were imposed, not the future value of the property. Correct? No, Your Honor. I disagree. What's your citation? My citation, Your Honor, is understanding the method that they were using. When you're using a discounted cash flow method, what you're doing is you're predicting what the future cash flows are. You're predicting what the future cash flows are. In terms of the sale process, if I may, just for a moment, the government argues that you've got to take into account the sale option and that you've got to take into account the use agreement option when you are valuing economic impact. They've acknowledged that what you're talking about here is the use agreement and the sale option. The special sale we set up under the statute at a price nobody in the real market would pay for properties under these restrictions. And we're financing 95 percent of the use as they were to say. They provide the money for the  options, which are the contracts. So what they're really saying is that if we provide cash to you while having taken away your property rights, you've got to take that cash into account as to whether the economic impact was great. And the problem with that was pointed out by the     they're saying that the government has to pay just compensation through the program itself. So if you allow that, the government can always pay cents on the dollar as part of the program. But it might not be sufficient. It might be found to be too few cents on the dollar and therefore there might be a taking. I don't think your argument goes where you say it goes. Well, Your Honor, we certainly can say that if the government, let's suppose that the government pays 80 cents on the dollar, they're taking. Let's take an easy example. You can't use your farm for forever. You have to sell the crops of your farm at cost forever. But don't say forever. That's not this case. This is a case that involves a couple of years of disputed time. 20 years of disputed time. Well, maybe. Well, in any event, your argument is that nothing the government gives should be weighed in the balance. I wouldn't say that, Your Honor. I don't go quite that far. No, no, we're not talking about Penn Central. In this case, under these regs and these statutes, in the second stage after the prepayment date, certain government benefits were available that were greater than those available before. And you seem to be saying, that doesn't matter. You're not allowed to take those into account. They don't cancel out anything by way of reduced rental rates. And I don't understand why they shouldn't. What if the dollar amount is exactly the equivalent? Suppose that I'm the owner, and listen to the hypothetical. I'm the owner, and I lose $100,000 in rental rates because I have to rent at below market rates under this program. And the government writes me a check for the equivalent amount. Under your analysis, it's still severe economic impact. That's right, Your Honor. That doesn't seem to make any sense, does it? Well, I think if we take what the government had said earlier, that you look to see whether you have the functional equivalent of a physical taking, then I would submit that if the government had done the functional equivalent of physical taking, in the physical context, and I know physical is different, but in the physical context, the government can't get away with taking your property and writing you a check for 80% of it. And I would suggest that if the government has done the functional equivalent of physically taking it, the taking's clause doesn't allow them to write a check for 60% or 80%. They've got to write a check for just compensation. That is precisely what Justice Lee was talking about. It's precisely what Judge Leto talked about. I'm not saying they don't get credit for it. What I'm saying is   did not include compensation on the program in what I'm calling stage two. The post prepayment date period. So the answer to my question is yes, Judge Leto excluded any consideration of the benefits of monetary value flowing to the landowners from HUD. As this court did  Whitley Benefits, Your Honor. In Whitley Benefits, the government said you can't mine the coal in your coal mine, but if you'd like, we've got an exchange program and you can trade off your rights for mining in this coal mine for another mine. But that's not a situation in which the restrictions on the particular property were lifted. You know, that's what we have here is that the government has created a program where there's a sale option, there's a use option, there's certain mitigation of the impact. And you're saying you can't take that into account in calculating economic impact. Well, what I'm saying earlier is the government didn't give us back any of our property rights that were taken. If you look at the property rights that were taken, they were in control of our property. How can that be, that they gave you the right to mine? They gave us money. Money? They didn't give you money under the circumstances. If you go through the sale option, why shouldn't the sale option be considered in determining economic impact. Let's discuss what you can do. The sale option was an option that if you chose it was going to take. There was no consideration of the value of the sale option. It was totally ruled out in determining economic impact. That's true. I agree. The reason you don't take into account is the government provided a couple of options. You have to use agreements. That's not true. You could prepay if you exercised the sale option and there wasn't a purchaser. If you couldn't make a fair value sale you could prepay. If you   sale you could prepay. We learned in this case we were in a low vacancy area and the court found it was doing the right things. We know we're in a low vacancy area and we have to wait three years before we could raise money. You could prepay immediately but it would be a three year restriction on the ability to raise money. All of that is ruled out. It's just not considered in the economic impact. Let me explain why I think it was rational to do so. The government provided two options. One was a use agreement option and the other was a sale option. You could not use those properties. That's because it was the financially greatest option of the two. If we were in a position today where we had taken the sale option, the sale hadn't worked out, the government would be sitting here today saying you should have chosen the use option. That was actually the better option. That's not the question. The question is whether the availability of the two options shouldn't be part of the analysis. You're saying no and some of us are wondering if that really is a sensible approach. I do think that Whitney is not only a good comparison but further out. In this case they offered you cash. If that's the closest analysis you can find in the case law, I don't think it's very close. I do believe that if the government is allowed to pay you partially in cash and get away from the taking, that is further along the line than if the government    pay you partially in cash and get away from the taking, that is further along the line than if the government is allowed to pay you partially in cash and get away from the taking. The whole picture should be looked at by the trier of fact. And your position is no, only the lost income can be taken into consideration and everything else falls outside the frame of the picture that's proper to consider. And people are questioning whether that's the best approach. And I don't mean to find anything different, your honor. I obviously don't know where this will come up. Why is it that you are so resistant to allowing the finder of fact to look at things other than the lost rent? Well, your honor, I guess all I can say is that as a matter of principle I don't think that the United States should be able to offer you cash up front and that that should count against whether there was a taking. I think in the end if they owe you  they owe it to you. And the fact that they choose to pay some of it up front shouldn't get them to look at it. We're just trying to follow the Supreme Court's orders from Penn Central that we have to measure the severity of the economic impact. We don't have any choice about that. We have to measure the severity of the economic impact. So the question is what do you look at in order to make that decision?  it a long-term option, long-term effects, possibly recouping the lost rents once the restriction is lifted and then the property value may go up? It's a question of how tightly you limit the analysis and what you exclude from the analysis. Your Honor, I can't say more than I have already that in my view it allows the government to cheat. It allows the government to pay part of the compensation up front rather than pay full. It may allow it. The government may be advantaged in paying part of the compensation up front and that may allow it to escape paying full compensation in the end. And I really don't think that the timing of when the government pays you that compensation should change the fact that it goes to full compensation. I understand that this can be looked at differently, Your Honor, but that's the reason because I think it's laid out very well by Justice Scalia in his separate opinions in  Court. He has three authorities, a concurring opinion, a dissenting opinion, and a cold case with vastly different factors. I don't think you have a very pertinent authority at all. Well, Your Honor, I don't think that there's very pertinent authority going the other way around. I think it's a sensible decision-maker want to look at in trying to determine what was the severity of the economic impact of the regulation here at rent control. Well, Your Honor, I don't think that this is precisely like rent control as the government believes. And if I may answer that, the reason that this isn't precisely like rent control, there are a couple of differences. Number one, under rent control, ordinarily, you can control. I wasn't meaning to analogize it to state rent control statutes, reduced rent, let's call it reduced rent, not rent control. Okay. In terms of the     on equity approach, I think it's entirely clear. I asked him the question, assuming one accepts the return on equity approach, what errors did the court make in its application of that approach? What do you understand the most?  think that the court considered certain factors when he was doing this analysis that he didn't consider when he was doing this economic impact analysis. They were talking about pay down with the mortgage. That's  they were talking about. The only difference is that on appeal they could try to enlarge that a bit by saying that you should also take into account appreciation of the property. What's your point, that by not being clear or more lengthy in the post-trial brief that somehow they waived the right here to make this argument? You have to give a consequence. If you're saying that it was unfair to the trial judge because it was so quickly lightly touched on then something has to follow from that. The only thing I can think of that might follow from that is waiver. We shouldn't entertain that argument. They didn't give the trial judge the right to argue that here. I think they waived it in particular. Where did you make that argument in your brief? Yes, we did. Where? Page 42. Thank you. The other  like to know is what is the argument that they waived? They waived the argument that other aspects of the trial judge were  the process. What they would have argued is that increases in equity that occurred during the time period should be taken into account. You're not arguing that they didn't raise the question about taking into account the sale option and the use option in terms of the economic return on equity approach. What errors do they say the judge employed? That's all I was trying to address. They made a couple of slight arguments. What they talked about today is two things I never heard of. One is the Fannie Mae rate went down from 8.5 percent. That's not in the Fannie Mae rate. It was a part of his argument that you would have to redo the calculations on an annual basis for the three-year period. That was one of the things he said as well. All I would suggest is that when they just said in one line, you should have done it differently. I think what they had to do was discuss what they were talking about. You should have calculated that the Fannie Mae rate went down. His argument was that all the figures in the formula would be different one year to the next and therefore to get an accurate computation you would have to use the differing numbers year by year. Second, all the formulas don't change. The numerator which is 6% doesn't change. So the question is did the denominator change? You would agree would you not that if one of the    court did was use the change in equity approach or the change in value approach or some other approach that the plaintiff has the burden of coming in with all the changes  equity and the change in returns approach but then it took a step back and said okay what was this significant amount of money what was the significant loss we're talking about. So in a sense it really tried to take a look at both ways of thinking about it. What was the change in return on equity and did it matter what was the substantial financial loss. The decision on remand in Rose Acre which I thought was when we're talking about potential hybrid the trial court decision. There's no further decision here. But it's just when we're looking at potential hybrids it might take into account the special circumstances where you've taken 20 years of someone's earnings during their lifetime but they might get money back later. One other way of thinking about it is you might be using the return on equity approach during the period but then taking that step back and saying was this a serious financial loss. In a sense Hodel took an approach that wasn't much different than that. Hodel found that the character of the taking given that what was taken was so integral and so long standing was awfully important in the way of having the analysis and took a look at what the economic impact was and found it was  getting into a formulaic approach. In this case given what we've got here is analogous to a holdover that might well be an approach to the  impact. So Hodel found  the economic impact   into a formulaic approach given that what we've got here is analogous to a holdover that might well be an approach to the    Hodel     into a formulaic approach given that what we've got here is analogous to a holdover that might well be an approach to the        what we've  is  to a holdover that might well be an approach to the Hodel into a formulaic approach given that what we've got here is analogous to a   might well be an  to the Hodel into a formulaic approach given that what we've got here is analogous to a holdover that might well be an approach to the Hodel     given that   is analogous to a  that might well be an approach to the Hodel into a formulaic approach given that what we've got here is             approach given that what we've got here is analogous to a that might well be an approach to the Hodel into a